UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
RAMON DE ANTONIO SMART,                  :
                                         :
                             Plaintiff,  :        08cv2203 (HB)
        -against-                        :        OPINION AND ORDER
                                         :
THE CITY OF NEW YORK,                    :
DANIEL MATTHEWS, JEFFREY                 :
FILIZZOLA, SAMUEL ZAROFF                 :
and ANTHONY PIAZZA,                      :
                                         :
                             Defendants. :
------------------------------------------------------X

**Hon. HAROLD BAER, JR., District Judge**:

On July 25, 2006, Plaintiff Ramon De Antonio Smart was arrested and detained by officers of the New York Police Department ("NYPD"). That incident forms the basis of Plaintiff's complaint, filed *pro se*, which alleges claims of false arrest, malicious prosecution, and violations of the First, Sixth, Eighth and Fourteenth Amendments to the Constitution, all in violation of 42 U.S.C. §1983 ("Section 1983"). Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL BACKGROUND

At approximately 1:00 in the morning on July 25, 2006, Ramon De Antonio Smart double-parked his 2000 BMW in front of his mother-in-law's house on O'Brien Avenue in the Bronx. (Pl.'s 56.1 Stmt. ¶ 1.) O'Brien Avenue is a two-way, public street and Smart crossed the street's centerline to stop alongside parked cars facing the opposite direction. (Transcript of Ramon Smart Deposition, 11/6/2008, ("Smart Depo. Tr.") at 145:16-25.) With the car running and the headlights and hazard lights on, Smart waited for his wife on the front steps the house. (*Id.* at 147:4-7, 22-24.) Then, a police car pulled up next to Smart's car and parked behind it.[1] (*Id.* at 149:1-6; 151:7-9.) The police officers, Defendants Matthews and Filizzola, exited their vehicle and Matthews attempted to open the driver's-side door of Smart's car. (*Id.* at 152:12-

---

[1] The arrest report prepared by the police officers states that a computer check of Smart's license plates "came up voluntarily surrendered." (Frank Decl., Ex H.) It is not clear from the record whether the police officers ran a computer check of Smart's license plates prior to exiting their squad car and approaching Smart's vehicle.

1

14.) Smart stood up and asked the officers if there was a problem. (*Id.* at 152:15-16.) Matthews asked whether Smart owned the double-parked BMW and Smart acknowledged the car was his. (*Id.* at 155:13-15.) Smart complied with Matthews' request to come down off the steps and turn the car off. (*Id*. at 156:5-12.)

Matthews then demanded the keys to Smart's car, but Smart refused to hand them over, maintaining that he had done nothing wrong. (*Id.* at 159:5-7.) Instead, Smart offered to provide Matthews with his license, registration, and proof of insurance. (*Id.* at 159:5-7.) Smart alleges that Matthews then twice lunged at him in failed attempts to snatch the car keys, first from Smart's hand and then from his pocket. (*Id*. at 159:13-25; 160:1-25.) Smart maintains that he jumped back, turned around, and called out to his wife, who had appeared on the front steps, telling her to go get her step-father. (*Id.* at 161:7-9.) Smart contends that at this point Matthews grabbed his shirt and Smart started to run towards the house, running past his wife with both Matthews and Filizzola in pursuit. (*Id.* at 162: 21-25.)

In contrast to Smart's account, in the Criminal Complaint filed later in the Bronx Supreme Court, Officer Filizzola stated that Smart struck him in the left side of the head before running into the house. (Declaration of Philip Frank dated 1/23/09 ("Frank Decl.") Ex. H.) It is undisputed that the officers followed Smart into the home and that in the hallway a physical altercation ensued during which Smart grabbed onto a stairway banister and refused to let go. (Smart Depo Tr. at 176:13-20; Frank Decl. Ex. H.) It is also undisputed that during the struggle Matthews sprayed pepper spray into Smart's face. (*See* Declaration of Ramon Smart, dated 3/2/09, Ex. 8 ("CCRB Interview of Matthews"); Ex. 9 ("CCRB Interview of Filizzola.")) Smart contends that the officers kicked and punched him while he was holding onto the banister, and that Matthews placed him in a chokehold. (Pl.'s 56.1 Stmnt. ¶8.)

Smart admits that after his hands were pried off the banister by his father-in-law, he lay on top of them to prevent the officers from handcuffing him. (Smart Depo. Tr. at 177:22-25.) But Smart maintains that at no time did he raise his hands or attempt to strike the officers, and maintains that after he was handcuffed the officers dragged him out the front door of the home by his legs, slamming his face into the right side of the concrete wall of the front steps. (Pl.'s 56.1 Stmt. ¶8.) The officers, for their part, contend that before he was restrained Smart flailed and twisted, tried to bite Matthews, escaped out the front door and then pushed Matthews, causing him to fall down the front steps and injure his leg. (*See* CCRB Interview of Matthews.) Matthews was treated at the Jacobi Medical Center for injuries to his leg. (*Id.*)

2

Smart was arrested, taken to the 43rd Precinct, and shortly thereafter was transported to Jacobi Medical Center where he was treated for abrasions and bruises. (Pl.'s 56.1 Stmt. ¶12.) Smart maintains that at the hospital, his eyes continued to burn from the pepper spray but the unidentified officer assigned to him did not permit his eyes to be flushed and refused to remove the handcuffs to allow Smart to be x-rayed. (Smart Depo. Tr. 187:8-9; 188:3-7; 189:9-16). Sometime between 8:30 and 9:00 a.m., Smart was transported back to the 43rd Precinct and placed in a holding cell. (Pl.'s 56.1 Stmt. ¶17.) Smart claims that he was held in the cell for more than fourteen hours without food, water or access to a restroom or a telephone and that he did not eat until approximately 1:30 a.m. on July 26, approximately 24 hours after his arrest, when he was taken to McDonald's as he was transported first to the 40th Precinct and then to Central Booking in the Bronx. (*Id.*; Smart Depo. Tr. 193:1-22.)

On July 26, 2006, Smart was arraigned on criminal charges of assault, resisting arrest, obstructing governmental administration, and harassment. (Frank Decl. Ex. H.) Smart appeared twice before the Bronx County Supreme Court before the charges against him were dismissed on January 24, 2007. (Pl.'s 56.1 Stmt. ¶21.) On May 21, 2008, the Court Clerk of the Supreme Court issued a Certificate of Disposition, which stated that pursuant to N.Y. CRIM. PRO. LAW §160.60 the dismissal deemed the arrest and prosecution "a nullity" and, pursuant to N.Y. CRIM. PRO. LAW §160.50(1C), the official record of the case was sealed. (Smart Decl. Ex. 23.)

On the night of his arrest the police also impounded Smart's BMW and provided him with a voucher that indicated the vehicle was taken into custody "for arrest evidence."[2] (Smart Decl. Ex. 24.) After the charges against him were dismissed, Smart obtained a District Attorney's Release for the vehicle, dated January 30, 2007. (*Id.*) Smart contends that shortly thereafter he made several phone calls to retrieve his car and "faxed his license, title, bill of sale, district attorney's release and a certificate of disposition to the NYPD Legal Bureau," but they refused to release his vehicle unless he paid $2,000.[3] (Pl.'s 56.1 ¶23.) A February 15, 2007 memorandum prepared by the NYPD's Vehicle Seizure Unit indicates that Smart had been offered a $2,000 settlement based on "[t]he underlying crimes, the value of the vehicle, and the

---

[2] Smart also contends that certain items of personal property, including a video camera and a radar detector, were in the BMW when it was impounded and not returned to him. (Pl.'s 56.1 Stmt. ¶20.) Smart did not receive a voucher for these items. (*Id.*)

[3] A telephone intake sheet from the NYPD's Vehicle Seizure Unit corroborates that in early February 2007, Smart informed the NYPD he had a district attorney's release for the vehicle. (Smart Decl. Ex. 25.)

defendant's criminal history." (Smart Decl. Ex. 25.) Although he acknowledges receipt of a letter from the NYPD that indicated he would be able to retrieve his car for $2,000, Smart contends that he was never informed of his right to a retention hearing. (Pl.'s 56.1 ¶23.) A May 5, 2008 memorandum recommended that NYPD Property Clerk dispose of Smart's vehicle because no formal demand had been timely filed. (Smart Decl. Ex. 25.) On July 29, 2008, the Smart's BMW was sold at a police auction for $3,800.00. (Smart Decl. Ex. 26).

On March 19, 2007, Smart was remanded to federal custody for an unrelated offense to which he later pled guilty. (Am. Compl. ¶66; Frank Decl. Ex. Q; *see* 06-cr-919 (RMB).) A criminal judgment dated January 29, 2009 ordered Smart to pay restitution to two banks and two taxing authorities and forfeit to the United States his interest in, among other things, the BMW.

## II. LEGAL STANDARD

A court will not grant a motion for summary judgment pursuant to Fed. R. Civ. P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 at 554-55 (quoting *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252.[4]

## III. DISCUSSION

### A. Claims Arising under Section 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). To establish

---

[4] Defendants contend that pursuant to Local Rule 56.1(c), Plaintiffs' statement of facts should be disregarded because it does not include correspondingly numbered paragraphs that respond to each of the statements in Defendants' statement. However, Plaintiff proceeds *pro se* and has made substantial effort to comply with Local Rule 56.1. Moreover, Plaintiff's Rule 56.1 Statement follows the same chronology of events as that of the Defendants. Accordingly, the Court will consider the competent evidence submitted by Plaintiff to ascertain whether there are disputed issues of material fact.

liability under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

### B.  Liability of Defendants Zaroff and Piazza

"'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).  Defendants Zaroff and Piazza were not among the officers who responded to the incident that led to Smart's arrest or otherwise involved in the commencement of criminal proceedings against him or impounding and auctioning his vehicle.  (*See* Smart Decl., Exs. 13, 15, 20.)  Consequently, Smart cannot establish that Zaroff or Piazza were personally involved in the events that give rise to his claims of false arrest, malicious prosecution, excessive force, or procedural due process violations and Defendants' motion for summary judgment with respect to such claims as asserted against Zaroff and Piazza is GRANTED.

Zaroff and Piazza were, however, the desk sergeants on duty at the 43rd Precinct where Smart was detained following his arrest.  (*Id.* at Ex. 20.)  Their potential liability for claims arising out of Smart's detention at the 43rd Precinct is addressed in Section III.G, below.

### C.  Qualified Immunity

The doctrine of "[q]ualified immunity 'shields police officers acting in their official capacity from suits for damages … unless their actions violate clearly-established rights of which an objectively reasonable official would have known.'" *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)).   In a Section 1983 case, on summary judgment it is proper to "first determine whether taken in the light most favorable to the party asserting the injury, the facts alleged show that the [defendants'] conduct violated a constitutional right . . . and only thereafter consider whether qualified immunity shields individual defendants." *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2007) (internal quotation marks and citations omitted).  Consequently, I address below whether the Defendants are entitled to qualified immunity only where the facts show a potential constitutional violation.

### D.  False Arrest

Liability for false arrest gives rise to liability under Section 1983.  *See Cook v. Sheldon,* 41 F.3d 73, 77-79 (2d Cir. 1994).  In analyzing claims alleging the constitutional tort of false

arrest, federal courts look to the law of the state in which the arrest occurred. *Russo*, 479 F.3d at 203. To state a claim for false arrest under New York law, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003).

Because the Defendants do not dispute that Smart was, in fact, arrested, the only question is whether the arrest was "privileged" or "justified." *Id.* at 76. Justification may be established by showing that the arrest was based on probable cause. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Probable cause exists when the police reasonably believe that "an offense has been or is being committed," *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir. 1987), *cert. denied,* 484 U.S. 1077 (1988), and is measured as of the moment of arrest. *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006).

Here, Matthews and Filizzola had probable cause to arrest Smart because they directly observed him violating New York's traffic laws. Smart acknowledges that he double-parked his car facing the opposite direction of traffic, a violation of New York State Vehicle and Traffic Law §1203, which requires that a "stopped, standing or parked" vehicle on a two-way roadway must be parked or stopped "parallel to and within twelve inches of the right-hand curb or edge of the roadway." (Smart Dep. Tr. 145: 16-25) Even though such a violation may be reasonably characterized as a "minor" offense, it is well-established that an officer's direct observation of even a minor traffic violation is sufficient probable cause to arrest the violator. *U.S. v. Scopo*, 19 F.3d 777, 781-782 (2d Cir. 1994) (officers had probable cause to stop and arrest defendant they directly observed violate traffic laws by not signaling lane changes notwithstanding that the violation was "minor"); *see also*, N.Y. VEH. & TRAF. LAW § 155 (McKinney 1986 & Supp.1994) ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); N.Y. CRIM. PROC. LAW § 140.10(1)(a) (McKinney 1992) (an officer may arrest a person for "[a]ny offense when [the officer] has reasonable cause to believe that such person has committed such offense in [the officer's] presence"); *People v. Cortes,* 382 N.Y.S.2d 445, 447 (Sup.Ct. 1976) (a police officer may arrest a person for a traffic violation committed in the officer's presence); *see also Virginia v. Moore*, 128 S.Ct. 1598, 1604 ("In a long line of cases we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence . . . [t]he arrest

is constitutionally reasonable.")  Because the officers had probable cause to arrest Smart, his claim of false arrest fails as a matter of law and Defendants' motion for summary judgment on this claim is GRANTED.[5]

### E. Malicious Prosecution

Liability for the tort of malicious prosecution can also give rise to liability under Section 1983. *Cook,* 41 F.3d at 77-79.  Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice."  *Savino*, 331 F.3d at 72.  To state a cause of action for malicious prosecution under Section 1983, a plaintiff must also show that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2000).

Here, Smart suffered a post-arraignment restraint on his liberty because he was required to post bail at his arraignment—a condition of which required him to be amenable to process in New York at all times—and to make at least two court appearances before the charges against him were dismissed.  Although in *Albright v. Oliver*, 510 U.S. 266 (1994), a Supreme Court plurality "refused to decide whether subjecting oneself to the restrictions that usually attach to release on bail constitutes a 'seizure' under the Fourth Amendment," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) (discussing *Albright*), the Second Circuit has stated that a defendant who was released on his own recognizance but required to make several court appearances and prevented by statute from leaving the state sufficiently alleged a deprivation of liberty that implicated the Fourth Amendment. *Rohman*, 215 F.3d at 216; *see also Kirk v. Metro. Transp. Auth.*, No. 99 Civ. 3787 (RWS), 2001 WL 258605, *15 (S.D.N.Y. March 14, 2001) (defendant's required court appearances rendered him effectively seized because he was "subjected to restraints not shared by the public generally") (quoting *Murphy v. Lynn*, 118 F.3d 938, 945 (2d Cir. 1997)). Consequently, the conditions of Smart's bail and his required post-arraignment court appearances constitute a restraint on his liberty sufficient to implicate the Fourth Amendment.

Turning to the elements of the state tort, Matthews' and Filizzola's liability for malicious prosecution turns on whether they knowingly made false statements about the circumstances of

---

[5] Because Smart's acknowledged violation of New York Vehicle & Traffic Law §1203 justified his arrest, the Court need not determine whether the allegedly invalid license plates on his vehicle or his act of running from the officers provided an independent justification for his arrest.

Smart's arrest. First, Defendants contend that they did not "initiate" the criminal proceedings against Smart because they did nothing more than report facts that the prosecutor considered in determining whether to initiate a prosecution. (Defs. Mem. at 11.) However, a police officer may be liable for malicious prosecution when it is found that he misrepresented or falsified evidence. *See White v. Frank,* 855 F.2d 956, 962 (2d Cir. 1988); *Taylor v. City of New York*, No. 03 Civ. 6477 (RLC) 2006 WL 1699606, *4 (S.D.N.Y. June 21, 2006). Smart contends that Matthews lunged and grabbed at him while they were talking and his wife corroborates this account in a sworn declaration. (Smart Tr. 160:4-5, 161:2-6; Declaration of Raquel Smart, dated March 2, 2009, ¶14.) The criminal complaint signed by Filizzola, however, states that as Smart was being questioned, he struck Filizola in the head and then ran inside the house. (Frank Decl., Ex H.) Whether Smart or the officers escalated the situation from a verbal to a physical confrontation is relevant to whether criminal assault charges against Smart were justified. *See, e.g., People v. Baez*, 118 A.D.2d 507, 508 (1st Dep't 1986) (use of abusive language does not make one an initial aggressor to whom justification defense is unavailable). It is for the jury to decide which account of the events is accurate, and drawing reasonable inferences in Smart's favor there is a genuine issue of fact as to whether Matthews and Filizzola falsely stated that Smart struck first.

Second, the criminal charges against Smart were terminated in his favor. The Court Clerk of the Bronx County Supreme Court certified that the dismissal of all pending charges on January 24, 2007 constituted a "termination of the criminal charges in the action in favor of the accused." (*See* Frank Decl., Ex. N.) Defendants do not contest that the criminal proceedings were terminated in Smart's favor.

Third, there is a genuine issue of material fact as to the existence of probable cause to commence criminal proceedings against Smart. The probable cause determination in a malicious prosecution claim—which differs from that relevant to a false arrest claim—is "whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Mejia v. City of New York*, 119 F.Supp.2d 232, 254 (E.D.N.Y. 2000) (citing *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir. 1999)). The protection afforded to law enforcement agents by probable cause is not available when the agents have knowingly made false statements to the prosecutor. *Taylor*, 2006 WL 1699606 (citing *White v. Frank,* 855 F.3d at 961-2). Because only the jury can properly decide whether Matthews and Filizzola falsely stated that Smart initiated the physical confrontation, there is a genuine issue of fact as to the existence

of probable cause to commence criminal proceedings against Smart for assault and resisting arrest. *See, e.g.*, *People v. Carneglia*, 63 A.D.2d 734, 735 (2d Dep't 1978) (reasonable acts of self defense may be justified where evidence "permits the inference that the defendant was the victim of an unprovoked police assault by the use of excessive physical force in effectuating an arrest"); *People v. Roman*, 28 A.D.3d 589, 590 (2d Dep't 2006) (in assault case, jury must be charged on "initial aggressor" concept where issue of fact exists as to who started the conflict).

Fourth, in a malicious prosecution action, malice is closely related to the lack of probable cause. *Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir. 1994). On a motion for summary judgment, malice may be inferred from evidence showing a lack of probable cause. *Id.* (citing *Maxwell v. City of New York,* 156 A.D.2d 28, 34-35 (1st Dep't 1990)). Consequently, there is a genuine issue of fact as to whether Matthews and Filizzola are liable for malicious prosecution.

Finally, when the facts are viewed in the light most favorable to Smart, it is clear that qualified immunity will not shield Matthews and Filizzola from Section 1983 liability for malicious prosecution. Filing a false police report violates clearly-established rights of which an objectively reasonable police officer should surely be aware. *See Jones*, 465 F.3d at 55. Consequently, Defendants' summary judgment motion as to the Section 1983 claims asserted against Matthews and Filizzola and based on malicious prosecution is DENIED.

### F. Excessive Force

A claim of excessive force in the context of an arrest is "properly analyzed under the Fourth Amendment's 'objective reasonableness standard.'" *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397) (internal quotation omitted). Of course, "not every push or shove" is unconstitutionally excessive, *Id.*, and courts, including this one, have granted summary judgment where the use of force was *de minimis*. *See Perkins v., Brown*, 285 F. Supp.2d 279, 283, (E.D.N.Y 2003) (medical records established use of force *de minimis*); *Bove v. City of New York*, No. 98 Civ. 8800 (HB), 1999 WL 595620, (S.D.N.Y. Aug. 6, 1999) ("bald and conclusory allegations" of beating and alleged injuries contradicted by hospital records insufficient to create genuine issue of fact as to excessive force). This is not, however, such a case.

Smart contends that the officers punched and kicked him in the hallway of the home, and that Officer Matthews sprayed pepper spray in his face from a distance of no more than 10 inches and placed him in a chokehold in violation of the New York Police Department Patrol Guide §203-11. (Pls. 56.1 Stmt. ¶¶ 7-8.) Smart further maintains that he was dragged out of the house by his legs while he was handcuffed and "jerked" so that his "face was slammed into the right side of the concrete wall of the steps" leading to the ground from the stoop. (*Id*. ¶10.) At a minimum, the Court cannot conclude that, if Smart was already handcuffed, it was an objectively reasonable use of force to drag him out of the house by his feet, to say nothing of slamming his head against the concrete steps. *See, e.g., Kerman v. City of New York*, 261 F.3d 229, 240 (2d Cir. 2001) (fact issues as to whether officers employed excessive force following the initial seizure and handcuffing of plaintiff precluded summary judgment.) Moreover, unlike the plaintiff's testimony in *Jeffreys*, 426 F.3d at 554, which was itself contradictory and incomplete, Smart's description of the officers' use of force has remained consistent from his interview with the Civilian Complaint Review Board in 2006 to his statement in opposition to the instant motion. (*See* Smart Decl. Ex. 4; Am. Compl. ¶¶ 15-17; Pls. 56.1 Stmt. ¶¶7-8). Smart's account is also consistent with that of the eye-witnesses. (*See, e.g.,* Raquel Smart Decl., ¶¶ 19-20, 25.) Although a fact finder may elect to discount the testimony of the eye-witnesses—his wife and mother-in-law—because of their close relationship to Smart, this is the type of credibility determination that is strictly the province of the jury. Accordingly, I cannot conclude as a matter of law that Matthews' and Filizzola's use of force was objectively reasonable or *de minimis* under the circumstances.

Finally, I cannot conclude as a matter of law that Matthews and Filizzola are protected by qualified immunity. Qualified immunity applies unless an officer's use of force violates "clearly established" constitutional rights and "even officers who are found to have used excessive force may be entitled to an extra layer of protection from the 'sometimes hazy border between excessive and acceptable force.'" *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Here, because Smart admits that he ran from the police into the house and, after his hands were pried from the banister, that he laid on top of them to prevent being handcuffed, (Smart Depo. Tr. 162: 22-25;177: 22-25.), the use of *some* force by Matthews and Filizzola was almost certainly justified. However, Smart maintains that Matthews placed him in a chokehold and that after he was handcuffed he was "slammed . . . face first" on the concrete steps outside the house. (Smart Depo. Tr. 181: 3-4.) If Smart's account of events is

credited, to grant qualified immunity to these policemen would be error. *See Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001). Accordingly, Defendant's motion for summary judgment as to Plaintiff's Section 1983 claim against Matthews and Filizzola premised on use of excessive force is DENIED.

### G. First, Sixth, and Fourteenth Amendment Claims

#### 1. First Amendment Claim

Although Smart's Amended Complaint alleges a violation of the First Amendment, presumably for being deprived of the ability to make telephone calls during his detention, he does not oppose Defendant's argument for summary judgment on this claim. Furthermore, the question of whether or not restricted telephone access impinges on a constitutional right is not settled, *Pitsley v. Ricks*, No. 96 Civ 0372 (NAM), 2000 WL 362023 (W.D.N.Y. 2000), and Smart does not dispute that he refused an offer to make a phone call shortly after his arrest on the morning of July 15, 2006. (*See* Defts.' 56.1 Stmt. ¶15.; Pl.'s 56.1 Stmt.) Because the contours of an inmate's right to use of the telephone are not clearly established, Defendants are entitled to qualified immunity from liability for alleged violations of the First Amendment arising from Smart's lack of access to a telephone during the period of his detention. Consequently, as it pertains to alleged violations of the First Amendment, Defendants' motion for summary judgment is GRANTED.

#### 2. Sixth Amendment Claim

Similarly, Smart appears to abandon his claim that his Sixth Amendment right to counsel was violated because he was denied access to a telephone to contact his attorney during the period of his detention. In any event, the Sixth Amendment right to counsel does not attach until the Government commits itself to prosecution by initiating adversary judicial proceedings, *Moran v. Burbine*, 475 U.S. 412, 431 (1986), and Smart was represented by counsel at his arraignment. (*See* Smart Depo. Tr. 194:14.) Accordingly, as it pertains to alleged violations of the Sixth Amendment, Defendants' motion for summary judgment is GRANTED.

#### 3. Substantive Due Process Claim

Smart contends that in violation of the Eighth Amendment he was subjected to cruel and unusual punishment at the hands of the NYPD because he was denied medical treatment and was later denied food, water and the use of a restroom for over 14 hours during his detention at the 43rd Precinct. However, because Smart was a pretrial detainee, "challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause[,] … not from

11

the cruel and unusual punishment standards of the Eighth Amendment." [6] *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007) (citing *Benjamin v. Fraser,* 343 F.3d 35, 49 (2d Cir. 2003)). Detainees have not been convicted of a crime, and consequently they "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Benjamin*, 343 F.3d at 49-50. Because different standards apply, I consider separately Smart's claims based on alleged denial of medical treatment and those based on the circumstances of his confinement at the 43rd Precinct.

      a. Denial of Medical Attention.

"The Second Circuit has applied the Eighth Amendment test for adequate medical care to a pre-trial detainee's right to the same." *Myrie v. Calvo/Calvoba*, 591 F.Supp.2d 620, 625 (S.D.N.Y. 2008) (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000)). Thus, officials in custody of a pretrial detainee "may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996). Here, no facts suggest Smart was deliberately denied medical attention for a serious medical condition. Smart contends that while at the hospital, the officer assigned to him prevented the prompt treatment for the pepper spray that had been sprayed in his eyes, but acknowledges his eyes were flushed by a nurse *after* he had seen a doctor. (Pl.'s Opp'n. at 20; Smart Depo Tr. at 189:13-23.) That the examining physician did not him or herself flush Smart's eye belies any argument that Smart's condition was sufficiently serious to support a constitutional violation. Smart's allegation that the officer refused to remove the handcuffs to permit Smart to be x-rayed fails for the same reason: a deferred diagnostic x-ray does not amount to denial of treatment for a serious medical condition. Consequently, to the extent Smart's Section 1983 claims are premised on alleged denial of adequate medical treatment, Defendant's motion for summary judgment is GRANTED.

      b. Denial of Food, Water and Access to a Restroom.

Smart's contention that he was denied access to a restroom from 9:00 A.M. to approximately 11:30 P.M. and denied food for the twenty-four hours that followed his arrest presents a closer constitutional question. Because a pretrial detainee "may not be punished in

---

[6] As he proceeds *pro se*, the Court liberally construes Smart's Eighth Amendment claims to assert claims under the Due Process Clause. *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir. 2000) (courts must interpret *pro se* pleadings "to raise the strongest arguments that they suggest").

any manner," *Benjamin*, 343 F.3d at 49-50, I must consider whether the particular circumstances of Smart's confinement rendered it punitive. *Iqbal*, 490 F.3d at 168. A condition of confinement that is "not reasonably related to a legitimate government objective" supports an inference of a punitive intent. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979)). Absent an express intent to punish, whether conditions of detention "appears excessive in relation to the alternative purpose assigned [to it]," is also relevant to whether it is punitive in nature. *Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 167 (1963)).

Smart contends that during the more than fourteen hours that he was detained at the 43rd Precinct the officers disregarded his repeated requests for food, water, and use of a restroom. (Pl.'s SOF at 5.) Smart avers that he became extremely dehydrated and "even after [he] had thrown up in the cell, [he] was still denied use of the restroom." (Am. Compl. ¶39.)[7] According to Smart, the officers to whom he directed his requests told him he needed to speak with his arresting officer or the desk sergeant on duty, but none of the officers responded to his requests. (Pl.'s SOF at 5.) Smart testified that although the officers acknowledged his "paper work" was complete when he arrived at the precinct at 9:00 A.M., he was not transferred to Central Booking until after 11:30 P.M. and that it was well known he was to be charged with assaulting an officer.[8] In support of this aspect of their motion, Defendants offer no facts to contradict those to which Smart would testify at trial.

Based upon the foregoing, a reasonable jury could conclude that the officer's consistent disregard of Smart's repeated requests was intended to have a punitive effect or, at a minimum, was not reasonably related to a legitimate governmental purpose which supports an inference of punitive intent. Although officers surely cannot be expected to cater to a pretrial detainee's every request and there are, for example, "legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station," *Webster v. City of New York*, 333 F.Supp.2d 184, 200 (S.D.N.Y. 2004), deliberate denial of food, water or access to a restroom for fourteen hours is not reasonably related to any legitimate governmental purpose and thus the facts before the Court support an inference of punitive intent. *See, e.g.*, *Mahase v. City of New*

---

[7] Smart verified his Amended Complaint by declaring under penalty of perjury that its contents are true. "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

[8] Smart testified that when he "got to central booking . . . all the officers were standing around, … everybody was asking 'who is the kid that assaulted the officer?'" (Smart Depo. Tr. 191:9-12; 194:19-23.)

*York*, 2000 WL 263742, 6 (E.D.N.Y. 2000) (on motion to dismiss, detainee deprived of toilet paper and telephone call and who alleged officers exhibited hostility towards her was entitled to inference that conditions were imposed in part to serve a punitive purpose); *cf. Rush v. Astacio,* No. 97-2661, 1998 WL 480751 at [*]2 (2d Cir. 1998) (absent allegation or evidence of intent to punish, denying pretrial detainee food for twelve hours while he was detained in a cold room did not violate his due process rights.)  At a minimum, such treatment appears excessive in relation to any alternative purpose that Defendants may attribute to it. *Bell*, 441 U.S. at 538.  Viewing Smart's testimony in its most favorable light and in the absence of any contradictory facts proffered by Defendants, a jury may reasonably conclude that the conditions of Smart's confinement violated his substantive due process rights under the Fourteenth Amendment.

Next, I must consider whether the Defendants were personally involved in the alleged constitutional violations and if they are entitled to qualified immunity. Defendants Zaroff and Piazza were the desk sergeants on duty during the period of detention.  (*See* Smart Decl. Ex. 20.) Matthews received medical treatment after Smart's arrest and it is not alleged that he was present at the precinct during the period of Smart's detention.  (See Am. Compl. ¶¶ 35-43; CCRB Interview of Matthews.)  However, Smart alleges that Filizzola visited him in the holding cell dressed in civilian clothing. (Am. Compl. ¶37.)  As a result of his direct interaction with Smart and in the absence facts to the contrary, Filizzola was personally involved in the alleged constitutional violations stemming from the conditions of his confinement.

In a conditions-of-confinement case such as this one, the personal involvement of a supervisor may be established by, *inter alia*, "showing that he directly participated in the violation," "failed to remedy the violation after being informed of it by report or appeal," or "was grossly negligent in supervising subordinates who committed the violation." *Iqbal*, 490 F.3d at 152 -153 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).  Drawing all reasonable inferences in Smart's favor and, again, without contradictory facts offered by the Defendants, Zaroff and Piazza had knowledge of Smart's requests based on the reasonable inference that officers with whom Smart did speak communicated his requests to the desk sergeants on duty.  If the alleged due process violations transgressed constitutional rights that are sufficiently well-established to deny the officers qualified immunity, Smart's testimony creates a genuine issue of a material fact as to whether Zaroff and Piazza were personally involved by failing to remedy the violations once they learned of them.

14

Considering the substantial amount of litigation on the subject, I find that a pre-trial detainee's right to be free from punitive confinement is well established.  *See, Benjamin*, 343 F.3d 49-50; *Iqbal*, 490 F.3d at 168 (citing *Bell v. Wolfish*, 441 U.S. 520, 537-38).  However, even when the law is clearly established, under the second element of the qualified immunity analysis a defendant is "entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions."  *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001) (citation and internal quotation marks omitted).  Nevertheless, in the absence of competing facts proffered by the Defendants, when Smart's testimony is viewed in its most favorable light a jury could not reasonably conclude that an objectively reasonable police officer would have doubts as to the illegality of deliberately denying Smart food, water or use of a restroom.  *See Johnson v. Testman*, 380 F.3d 691, 698 (2d Cir. 2004) (affirming denial of motion to dismiss on qualified immunity grounds where detention center guard left the plaintiff handcuffed in his cell for seven hours for no apparent reason.)  Consequently, neither Filizzola, Zaroff, nor Piazza are entitled to qualified immunity and Defendant's motion for summary judgment for Smart's Section 1983 claims against these defendants based on the circumstances of his detention at the 43rd Precinct is DENIED.

### H. Section 1983 Claims Against City of New York

In order to hold a municipality liable as a "person" within the meaning of Section 1983, the plaintiff must prove the existence of both a policy that shows the municipality took some action that caused his injuries and a causal link between the policy and the deprivation of constitutional rights.  *See Monell v. Department of Social Services*, 436 U.S. 658, 609-91 (1978); *Vives v. City of New York*, 524 F.3d 346, 352 (2d Cir. 2008).  Neither does Smart's complaint allege nor does the record contain any facts that suggest that the City of New York had a custom or policy that caused Smart's injuries, and Smart does not contend otherwise in opposition to the instant motion.  Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Section 1983 claims against the City of New York is GRANTED.

### I. State Law Claims

Pursuant to NEW YORK GENERAL MUNICIPAL LAW §50-e, a plaintiff who asserts state law tort claims against a municipal entity or against its employees for acts that occurred within the scope of their employment must file a notice of claim within ninety days after the incident giving rise to the claim or, with leave of court, within one year and ninety days after accrual of the

15

action. *See Nunez v. City of New York*, 307 A.D.2d 218, 219, (1st Dep't. 2003). Late service of a notice of claim without leave of court is a nullity. *Laroc v. City of New York*, 46 A.D.3d 760, 761 (2d Dep't. 2007). Furthermore, an action based on the notice of claim must be commenced within one year and ninety days after the incident that gives rise to the claim. NEW YORK GENERAL MUNICIPAL LAW §50-i. Here, although Smart contends that he filed a notice of claim on October 18, 2006, he did not file this action until March 5, 2008, which is more than one year and ninety days after the events of July 25-26, 2006 which give rise to his state law claims related to the circumstances of his arrest.

Smart's malicious prosecution claim did not accrue until the criminal charges against him were terminated in his favor in January 2007. *See Nunez v. City of New York*, 307 A.D.2d 218, 219 (1st Dep't. 2003). However, Smart does not allege that he filed a notice-of-claim for a malicious prosecution claim under state law. Consequently, Defendants' motion for summary judgment is GRANTED with respect to Smart's state law claims.[9]

### J. Procedural Due Process Claims

Finally, Smart's Amended Complaint is liberally construed to assert procedural due process claims based upon the NYPD's sale of his 2000 BMW at police auction, allegedly without providing Smart with notice of his right to a retention hearing. Although New York City's forfeiture statutes are no stranger to constitutional due process challenges, *see e.g. Krimstock v. Kelly*, 506 F.Supp.2d 249 (S.D.N.Y. 2007), Smart is foreclosed from asserting such a challenge here because he forfeited his interest in the BMW to the United States in connection with the criminal judgment against him.[10]

---

[9] The Court will reconsider this disposition with respect to Smart's malicious prosecution claim under New York law if he is able to establish that he filed a notice-of-claim within ninety days of the date on which the criminal charges against him were terminated in his favor.

[10] To the extent he asserts them, Smart's Section 1983 claims based on the loss of personal property he alleges was in the vehicle when it was impounded also fail as a matter of law because Smart had adequate remedies to recover the property under state law. *See*, *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (unauthorized intentional deprivation of property by prison guard did not constitute violation of due process clause because meaningful post-deprivation remedies for the loss were available under state law). As alleged by Smart, the deprivation resulted from "random and unauthorized" acts instead of the "operation of established state procedures," and therefore the existence of state law remedies—namely, the administrative procedures for return of property held in police custody and an action under Section 9 of the New York Court of Claims Act for appropriation of personal property—defeat Smart's Section 1983 claim. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir. 1990).

"It is well-established that a valid liberty or property interest is an essential prerequisite to the successful assertion of due process rights, and that property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Grossman v. Axelrod*, 646 F.2d 768, 770 -771 (2d Cir. 1981) (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *see also Gordon v. Alexander*, 592 F.Supp.2d 644, 652 (S.D.N.Y. 2009). Pursuant the federal criminal forfeiture statute, 18 U.S.C. § 982, "the court, in imposing sentence on a person convicted of a violation of [*inter alia,* 18 U.S.C. §§ 1028, 1029, and 1343 (affecting a financial institution)] . . . shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." "[O]nce the Government wins a judgment of forfeiture, the relation-back doctrine provides that the right, title, and interest in the forfeited property vests in the United States at the time the defendant committed the offense that gives rise to the forfeiture." *U.S. v. Emerson*, 128 F.3d 557, 567 (7th Cir. 1997) (citing 18 U.S.C. § 982 (which incorporates by reference the relation-back doctrine of 21 U.S.C. § 853(c)).

Here, Smart forfeited his interest in the BMW to the United States pursuant the criminal judgment that followed his guilty plea to violations of 18 U.S.C. §§ 1028, 1029, and 1343, which, according to the indictment, were alleged to have occurred between January and August 11, 2006. *See* 06-CR-919(RMB), Doc. No. 10, Indictment, filed October 4, 2006. Consequently, regardless of the NYPD's actions, Smart lost title to the BMW when he committed the offenses to which he later pled guilty, i.e. prior to August 11, 2006. Because the property interests protected by the Due Process Clause "are created and their dimensions are defined by existing rules or understandings that stem from an independent source," *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972), by virtue of the operation of the federal criminal statutes Smart had no constitutionally cognizable property interest in the vehicle during the period in which it is alleged that he was denied due process.[11]

---

[11] Smart argues that he suffered financial injury because he "remains responsible for the value of said BMW in restitution . . . to the federal government." (Pl.s' Opp'n. at 19.) However, "because forfeiture and restitution serve distinct goals, a defendant generally has no right or entitlement to use forfeited funds to satisfy an additional restitution obligation." *U.S. v. O'Connor*, 321 F.Supp.2d 722, 729 (E.D.Va. 2004). Although I have neither authority nor inclination to interpret Judge Berman's sentence, I note that because Smart pled guilty to fraud offenses, it appears that the restitution ordered to be made to two banks and two taxing authorities was mandatory and imposed *in addition to* any other authorized penalty. *See* 18 U.S.C. § 3663A(a)(1). Furthermore, pursuant to 18 U.S.C. §982(a)(2), forfeiture of any property obtained directly or indirectly as a result of the fraud was *also* mandatory and thus calls for a separate penalty.

Smart's failure to allege facts that support a reasonable inference that any of the individual Defendants were personally involved in the administration of his claim for return of the BMW or its sale at police auction or that suggest his damages stem from a policy or custom of the City, is an independent reason why Smart's Section 1983 claim for procedural due process violations must fail as a matter of law. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Vives v. City of New York*, 524 F.3d 346, 352 (2d Cir. 2008). Accordingly, Defendants' motion for summary judgment with respect to Smart's procedural due process claims is GRANTED.[12]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to (i) all claims against the City of New York; (ii) all state law claims; (iii) Plaintiff's Section 1983 claims premised on false arrest, procedural due process violations, and violations of the First and Sixth Amendment against all Defendants, (iv) Plaintiff's Section 1983 claims premised on malicious prosecution and use of excessive force against Defendants Zaroff and Piazza; and (v) Plaintiff's Section 1983 claims premised on violations of the due process clause of the Fourteenth Amendment for the conditions of Plaintiff's pretrial detention against Defendants Matthews. Defendant's motion for summary judgment is DENIED with respect to

---

Although, the Government has broad discretion to direct disposition of forfeited property including to victims of the crime, *see* 21 U.S.C. §853(i), nothing in the criminal judgment indicates that Smart is entitled to offset the value of the BMW against his restitution obligations. The mere possibility that the Government *might* have elected to "credit" the value of the BMW towards restitution does not give Smart a constitutionally cognizable property interest in the vehicle.

[12] It merits note, however, that on the limited record before me I would be unable to conclude as a matter of law that the NYPD complied with applicable municipal regulations or the standards of constitutional due process, and I am dubious that the NYPD would have ultimately prevailed in a forfeiture action in which it bore the burden to prove that the BMW was an instrumentality of the crimes for which Smart was arrested. The NYPD was within its rights to elect to seek forfeiture of the vehicle after the charges against Smart were dismissed, and they appear to have done so within twenty-five days of their receipt of the district attorney's release as required. *See* 38 R.N.Y.C. §12-36; *McClendon v. Rosetti*, 460 F.2d 111 (2d Cir. 1972). Although Smart acknowledges he received a February 10, 2007 letter offering settle the forfeiture proceeding for $2,000, that letter is not part of the record before me and consequently I cannot render an opinion as to whether it provided adequate notice of Smart's rights to a retention hearing as required by the decisions in *Krimstock v. Kelly*, *see e.g.* 306 F.3d 40, 69 (2d Cir. 2002), or an adequate statement of the grounds upon which the property clerk sought to justify the forfeiture as required by 38 R.C.N.Y. §12-36(b). However, to the extent its present posture requires me to view the facts of this case in the light most favorable to Smart, who contends that the letter he received directed him to *either* pay $2,000 *or* forfeit the car, I have grave reservations as to the constitutional propriety of phrasing a settlement offer—in a case in which the NYPD ultimately has the burden to prove the impounded vehicle constitutes an instrumentality or the proceeds of a crime—so as to cause claimants to believe that they must choose between the proposed settlement offer or forfeiture of their vehicle.

(i) Plaintiff's Section 1983 claims against Defendants Matthews and Filizzola to the extent premised on malicious prosecution and use of excessive force; and (ii) Plaintiff's Section 1983 claims against Defendants Filizzola, Zaroff and Piazza premised on the conditions of Plaintiff's pretrial detention.

SO ORDERED
New York, New York
March 30, 2009

_____
U.S.D.J